## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **ANDREW GARY SIGAI,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 11-1130-DDC-KGG** |
| **METROPOLITAN LIFE INSURANCE COMPANY, as Administrator of the Philips Electronics North America Long-Term Disability Program,** | |
| **Defendant.** | |

## MEMORANDUM AND ORDER

Plaintiff brings this action under 29 U.S.C. § 1132(a)(1)(B) of the Employment Retirement Income Security Act of 1974 ("ERISA") to recover unpaid benefits allegedly due to him under the terms of a long-term disability plan (the "Plan") issued by defendant. Plaintiff also seeks declaratory relief requesting that the Court enjoin defendant's actions that violate the Plan and enforce the Plan under 29 U.S.C. § 1132(a)(3). Additionally, plaintiff requests attorney's fees and costs under 29 U.S.C. § 1132(g)(1).

This matter is before the Court on defendant's Motion for Summary Judgment (Doc. 59) and plaintiff's Motion for Judgment on the Administrative Record (Doc. 61). As set forth below, based upon a review of the evidence in the administrative record, the Court finds that plaintiff has not established that he met the definition of "disability" under the Plan before he retired from his employment on May 1, 2007, and his coverage under the Plan terminated. Therefore, the Court rules that plaintiff is not entitled to benefits under the Plan and accordingly grants

defendant's Motion for Summary Judgment (Doc. 59).  Likewise, the Court denies plaintiff's

Motion for Judgment on the Administrative Record (Doc. 61).

## I.      FACTUAL BACKGROUND

The following facts are uncontroverted.  Plaintiff was employed by Philips Electronics

North America Corporation ("Philips") as a Fellow Engineer.[1]  The last day that plaintiff worked

for Philips was April 30, 2007.[2]  His employment with Philips terminated effective May 1, 2007,

due to retirement.[3]  Plaintiff was 62 years old at the time of his retirement.[4]

*The Plan*

While employed, plaintiff participated in the Philips Electronics North America

Corporation Signature Long Term Disability Plan (also known as the Philips Electronics North

America Corporation Long-Term Disability Program) (the "Plan") which is governed by ERISA,

29 U.S.C. §§ 1001, *et seq.*  At the time of plaintiff's retirement and through 2008, the Plan was

funded by a group policy of long term disability ("LTD") insurance issued by defendant to

Philips.[5]  Defendant served as the claims administrator for the Plan and was responsible for

claims' determinations and for determining appeals from denials of claims.[6]

The Plan's Summary Plan Description ("SPD") provides the following definition of

disability:

---

[1] Administrative Record (Docs. 58, 58-1, 58-2, & 58-3) (hereinafter "AR") at ML02205.

[2] *Id*. at ML00099.

[3] *Id*.

[4] *Id*. at ML00002.

[5] Doc. 60-2 at ML02254, ML02273–74.

[6] *Id.* at ML02255–56, ML02273.

**Definition of Total Disability**
**On or After January 1, 2002**

For those who become disabled January 1, 2002 and after, the definition of
"disability" below will apply:

- For the first 2 ½ years, you will be considered disabled if you are unable to
  earn more than 80% of your indexed pre-disability earnings at **your own
  occupation** for any employer in your local economy.
- After 2 ½ years, you will be considered disabled if you are unable to earn
  more than 60% of your indexed pre-disability earnings from any employer, at
  **any occupation** for which you are reasonably qualified, taking into account
  your training, education, experience and pre-disability earnings.
  **. . .**

In all cases, "Disability" means that due to sickness, pregnancy or accidental
injury, you are receiving appropriate care and treatment from a medical doctor on
a continuing basis.[7]

The SPD also provides:

**When LTD Coverage Ends**
Your long-term disability coverage ends on the earliest of the following dates,
provided that you are not receiving an LTD benefit:

- When you are no longer an eligible employee (e.g., you become a part-time
  employee working less than twenty hours per week)
- When the program is terminated
- When you retire
- When you go on strike or are locked out
- When your employment terminates
  If you are on an unpaid lay off or an unpaid leave of absence, your coverage stops
  on your last day of work.[8]

The Plan's certificate of insurance also defines "Disability" and describes the circumstances

under which coverage ends.[9]   The certificate of insurance also provides:

**Proof of Disability**

Provide proof of Disability within 3 months after the end of your Elimination
Period.

---

[7] *Id.* at ML02266.

[8] *Id.* at ML02268–69.

[9] *Id.* at ML02234, ML02243.

No benefits are payable for claims submitted more than one year after the date of Disability. However, you can request that benefits be paid for late claims if you can show that:

1.      it was not reasonably possible to give written proof of Disability during the one year period; and

2.      proof of Disability satisfactory to us was given to us as soon as was reasonably possible.

. . .

**Legal Actions**

No legal action of any kind may be filed against us:

1.      within the 60 days after proof of Disability has been given; or
2.      more than three years after proof of Disability must be filed. This will not apply if the law in the area where you live allows a longer period of time to file proof of Disability.[10]

The Plan gives discretionary authority to defendant by providing:

**Discretionary Authority of Plan Administrator
and Other Plan Fiduciaries**

In carrying out their respective responsibilities under the Plan, the Plan administrator and other Plan fiduciaries shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan. Any interpretation or determination made pursuant to such discretionary authority shall be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious.[11]

The SPD provides the same discretionary authority to defendant:

**Discretionary Authority**
MetLife shall have the exclusive right, power, and authority in its sole and absolute discretion to administer, apply and interpret the plan and any other plan documents, and to determine eligibility for and entitlement to plan benefits and to

---

[10] *Id.* at ML02244, ML02246.

[11] *Id.* at ML02257.

decide all matters arising in connection with the operation or administration of the plan.[12]

### Plaintiff's Social Security Claim and Award

After retiring from Philips in May 2007, plaintiff moved from Kansas to New Hampshire.[13]  In New Hampshire, plaintiff sought treatment from a cardiologist, Mary-Claire Paicopolis, M.D.[14]  After plaintiff had an abnormal stress test, Dr. Paicopolis referred him to Beth Israel Deaconess Medical Center for a cardiac catheterization, which occurred on January 31, 2008.[15]  On September 8, 2008, Dr. Paicopolis asked plaintiff to apply for Social Security disability.[16]

Plaintiff's Social Security disability claim was initially denied,[17] but in a February 26, 2010, decision, an Administrative Law Judge ("ALJ") awarded plaintiff Social Security disability benefits.[18]  In that decision, the ALJ determined that plaintiff had been disabled under sections 216(i) and 223(d) of the Social Security Act since May 1, 2007.[19]

### Plaintiff's Claim to Sedgwick Claims Management Services, Inc.

Plaintiff first submitted a claim to Sedgwick Claims Management Services, Inc. ("Sedgwick"), the claims administrator for Philips Salary Continuance benefits, on May 20,

---

[12] *Id.* at ML02272.

[13] AR at ML02167.

[14] *Id.* at ML01658–60.

[15] *Id.*

[16] *Id.* at ML01803.

[17] *Id.* at ML00784–87.

[18] *Id.* at ML02174–78.

[19] *Id.*

2010.[20]  Sedgwick denied plaintiff's claim in letters dated May 21, 2010, and August 18, 2010.[21]

In the August 18, 2010 letter, Sedgwick described the claim as a one for short term disability

("STD") benefits.[22]  Sedgwick further stated that it was denying the claim because plaintiff's

accident and sickness insurance terminated on his last day of work, April 30, 2007, and his first

day of disability was May 1, 2007.[23]  Plaintiff appealed the denial,[24] and Sedgwick upheld the

denial by letter dated January 17, 2011.[25]

### Plaintiff's LTD Claim to Defendant

Plaintiff submitted his LTD claim to defendant in a letter dated March 7, 2012.[26]  In that

letter, plaintiff explained that he "was dealing with multiple medical issues prior to his leaving

Philips' employment, including diabetes, hypertension, sleep apnea, restrictive lung disease,

coronary artery disease, and hypercholesterolemia."[27]  Plaintiff submitted the following

documents with his LTD claim:  the fully favorable decision of the Social Security

Administration and accompanying notification,[28] portions of his application for Social Security

---

[20] *Id.* at ML01985–87.

[21] *Id.* at ML02162, ML02166.

[22] *Id.* at ML02162.

[23] *Id.*

[24] *Id.* at ML01999–2000.

[25] *Id.* at ML01193–94.

[26] *Id.* at ML02167–69.

[27] *Id.* at ML02168.

[28] *Id.* at ML02170–78.

disability benefits,[29] some medical records,[30] Dr. Paicopolis' Medical Source Statement (that was submitted to the Social Security Administration),[31] and MetLife's Personal Profile forms.[32]  In the Personal Profile form, plaintiff listed his physicians and their specialties:  Mary-Claire Paicopolis, M.D., Gilford, NH, Cardiology; Roger J. Laham, Beth Israel Deaconess Medical Center, Boston, MA, Interventional Cardiology; Paula Goodman Fraenkel, Beth Israel Deaconess Medical Center, Boston, MA, Hematology / Oncology; Susan Herzlinger Botein, Joslin Clinic, Boston, MA, Endocrinology, Diabetes & Metabolism; David Roberts, Beth Israel Deaconess Medical Center, Boston, MA, Pulmonary, Critical Care & Sleep Medicine; Jacqueline Chang, Beth Israel Deaconess Medical Center, Boston, MA, Pulmonary, Critical Care & Sleep Medicine; Mark Slovenkai, Boston Sports & Shoulder Center, Waltham, MA, Orthopedic Surgery (foot); Paul Weitzel, Boston Sports & Shoulder Center, Waltham, MA, Orthopedic Surgery (shoulder); Anthony Aversa, Dermatology Associates, Concord, NH, Dermatology; Kirsten Helling, Coppola Physical Therapy, Tilton, NH, Physical Therapy; Salina Clinic, L.L.C., Salina, KS.[33]

On April 26, 2012, defendant interviewed plaintiff by telephone.[34]  Defendant also received medical records from plaintiff's listed physicians, some of which are described in more detail below.

---

[29] *Id.* at ML02179–80.

[30] *Id.* at ML02181–88, ML0220.

[31] *Id.* at ML02189–99.

[32] *Id.* at ML02201–17.

[33] *Id.* at ML02214.

[34] *Id.* at ML00052–64.

### *Records from Dr. Hanson of the Salina Clinic*

On July 6, 2005, plaintiff visited Dr. Hanson, who noted plaintiff's history of a myocardial infarction in 1994 and plaintiff's "insulin dependent diabetes mellitus since 1988, controlled with diet and meds, hypertension, hypercholesterolemia."[35]  On September 2, 2005, Dr. Hanson recommended that plaintiff see Wini Schaedel, ARNP, Certified Diabetes Educator.[36]  Plaintiff had several office visits with Dr. Hanson in 2005 and 2006 for various issues, including bronchitis, upper respiratory infections, and sleep apnea.[37]

On February 23, 2007, plaintiff had another visit with Dr. Hanson.[38]  Dr. Hanson's office notes from that visit state:

> This 62-year-old gentleman presents today stating that he just finds himself on edge an awful lot.  He is under a lot of situational stress that has resulted in him just not enjoying life.  He is currently rethinking that [sic] he might do in terms of either staying on with Philips or maybe retiring.  He is remodeling a home that [he] has back in the New Hampshire area.  The patient is otherwise doing well. He has insulin dependent diabetes that he is learning to bring under control.  He is being managed for hypertension, as well as hypercholesterolemia.[39]

Dr. Hanson's impression was "acute situational stress and depression," and he prescribed Cymbalta and Ativan.[40]

Plaintiff visited Dr. Hanson again on May 7, 2007, for an infected right index finger which was lacerated by a food processor on April 30, 2007.[41]  Plaintiff received follow-up care

---

[35] *Id.* at ML01224.

[36] *Id.* at ML01227.

[37] *Id.* at ML01228–36.

[38] *Id.* at ML01237.

[39] *Id.*

[40] *Id.*

[41] *Id.* at ML01237, ML01240.

for his finger injury at the Salina Clinic on May 14, 2007 and May 30, 2007.[42]  There are no records of Dr. Hanson or anyone at the Salina Clinic seeing plaintiff after May 30, 2007.[43]

Dr. Hanson's records include a September 8, 2010 email from plaintiff to Dr. Hanson.[44] In this email, plaintiff explained to Dr. Hanson that he had been awarded Social Security disability benefits based on a determination that he "was disabled dating to the time [he] left Philips."[45]  Plaintiff further stated in the September 8, 2010 email:

> The only reason I took "retirement" is that it was a clean way to get cash flow started without litigation.  But now that I know what my situation is now, I believe I would have qualified for disability.  Basically the insurance co. will dispute the one or two days prior to Social Security declaring me disabled as to issue for declining my petition with the [sic] for disability under Philips.
>
> When I visited with you we discussed disability, but I did not realize I was as sick as I was at the time.  So can I discuss this whole thing with you and get your input?  If so when would be a good time for me to call?[46]

On October 1, 2010, one of plaintiff's attorneys wrote Dr. Hanson, stating in part:

> The purpose of this letter is to request that you provide us with your opinion regarding the actual date that [plaintiff], in your opinion, was no longer able to continue his employment.  If you are not comfortable providing a specific date, then I would appreciate if you would express your opinion as to whether the onset of his disability pre-dated his last day of work on April 30, 2007.[47]

On October 5, 2010, Dr. Hanson responded in a letter to plaintiff's attorney stating:

> In regards to an actual date that [plaintiff] was no longer able to continue his employment, I cannot determine such from my medical records.  Nor, do I have

---

[42] *Id.* at ML01239–40.

[43] *Id.* at ML01206–1388.

[44] *Id.* at ML01388.

[45] *Id.*

[46] *Id.*

[47] *Id.* at ML01386.

an opinion as to whether the onset of his disability pre-dated his last day of work on April 30, 2007.[48]

### Records from Wini Schaedel, APRN

On April 9, 2012, Wini Schaedel, APRN, provided defendant an Attending Physician Statement ("APS"), which stated that she had not seen plaintiff since May 2007.[49]  She also provided her office notes for three of plaintiff's visits on February 1, 2007, April 3, 2007, and May 22, 2007.[50]  The office note dated February 13, 2007, lists Ms. Schaedel's assessment as "Type II Diabetes; improved control, hypertension, hyperlipidemia" and states that plaintiff "[w]as good about exercise on vacation.  Has not been since he has been back.  Hopefully, after he retires the 1st of May he will get into an exercise regime."[51]  On plaintiff's next visit on April 3, 2007, Ms. Schaedel's assessment was:  "Type 2 diabetes.  Higher A1C.  Hypertension, Hyperlipidemia."[52]  Plaintiff's final visit was on May 22, 2007, at which time Ms. Schaedel's assessment was:  "Type II Diabetes.  Fair control.  Hypertension.  Hyperlipidemia."[53]  On that date, Ms. Schaedel completed a form titled "Diabetes Behavior Change Goals Assessment Summary and Take Home Instructions" that listed "work" as a way to improve physical fitness for plaintiff. [54]

After reviewing Ms. Schaedel's records, defendant noted:

---

[48] *Id.* at ML01384.

[49] *Id.* at ML01936–39.

[50] *Id.* at ML01941–46.

[51] *Id.* at ML001946.

[52] *Id.* at ML01944.

[53] *Id.* at ML01942.

[54] *Id.* at ML01941.

This NP specializes in diabetes.  Saw claimant 5/22/2007 for Type 1 [sic] Diabetes.  No R&Ls provided—nor certification that claimant can't work.  The 5/22/2007 Diabetes Behavioral Change Goals Assessment Summary and Take Home instructions provided with this APS actually list working as one of his goals.  There is mention that the claimant is moving to New Hampshire.  There is also an office note from 4/3/2007 where he was also treated for diabetes.  It notes in this document that the claimant is retiring.  No R&Ls and no mention of inability to work or need to stop working—again, working is noted as a goal in his treatment plan.[55]

### *Additional Information Concerning Plaintiff's Treatment for Diabetes*

Defendant also received an APS form,[56] dated April 30, 2012, from endocrinologist Barrett Chapin, M.D., who treated plaintiff from February 13, 2008, through July 14, 2011.[57]  Dr. Chapin stated on the APS form that plaintiff had no limitations from diabetes.[58]

The office of Susan Herzlinger Botein, M.D., contacted defendant on April 19, 2012, and advised that the doctor "doesn't agree with the disability" and was not filling out the APS form but would send office visit notes to defendants.[59]

### *Records from Plaintiff's Cardiologists*

Mary-Claire Paicopolis, M.D., plaintiff's cardiologist in New Hampshire, provided defendant an APS form, dated April 24, 2012.[60]  On the APS form, Dr. Paicopolis listed

---

[55] *Id.* at ML00027–28.

[56] *Id.* at ML01595–98.

[57] *Id.* at ML01732–69.

[58] *Id.* at ML01596.

[59] *Id.* at ML00031.

[60] *Id.* at ML01711–14, ML01716.

plaintiff's primary diagnosis as coronary artery disease and his secondary diagnosis as diabetes mellitus.[61]  Dr. Paicopolis also recommended "no work."[62]

Dr. Paicopolis first treated plaintiff on December 12, 2007 (more than seven months after his retirement from Philips).[63]  She conducted an echocardiogram on December 14, 2007.[64]  Dr. Paicopolis next saw plaintiff on January 28, 2008.[65]  During that visit, plaintiff complained of fatigue.[66]  Dr. Paicopolis noted that plaintiff was scheduled for a sestamibi stress test the following day.[67]  After an abnormal result on plaintiff's stress test, Dr. Paicopolis referred plaintiff to Beth Israel Deaconess Medical Center in Boston for cardiac catheterization.[68]  On January 31, 2008, Roger Laham, M.D., performed the cardiac catheterization, diagnosed two vessel coronary artery disease and systemic hypertension, and recommended: "trial of medical therapy.  If this fails, attempt at origin/proximal LCX intervention."[69]

Dr. Paicopolis saw plaintiff again on February 4, 2008, and noted:

Since the patient was last seen, he had a left heart catheterization, which showed a 70% ostial circumflex lesion as well as a PDA lesion which is about 80%.  All LAD lesion distally in the vessel by 80% and about 60 to 70% on the LAD.  His left circumflex origin has 60% lesion.  There is a 70% proximal lesion.  Dr. Laham did not want this stented at this time, because of it, he would have to put

---

[61] *Id.* at ML01714.

[62] *Id.* at ML01713.

[63] *Id.* at ML01792–93.

[64] *Id.* at ML01817–20.

[65] *Id.* at ML0179.

[66] *Id.*

[67] *Id.*

[68] *Id.* at ML01658–60.

[69] *Id.* at ML01726–27.

the stent across the left main.  He wants to try medical therapy.  If he fails medical therapy, he will be stented.[70]

On March 20, 2008, Dr. Paicopolis noted: "In general, he is feeling well."[71]  She also stated that plaintiff had ischemic heart disease and that "last catheterization showed disease in the circumflex and distal LAD."[72]  She planned to schedule plaintiff for a sestamibi stress test, and she increased his medications.[73]

On September 8, 2008, Dr. Paicopolis again treated plaintiff and noted:

Since the patient was last seen, he has had some intermittent chest discomfort.  He told [sic] he is fatigued and he can only work about two hours without extreme fatigue.  Of note, he has significant ischemia with stress testing, but at this point he is at high-risk intervention.  At this point, we will try to treat him medically.  He has problems with doing his job because of these thoughts, not as clear, because of his underlining [sic] cardiovascular sleep apnea and diabetes conditions.  I do not feel that he can work as an engineer and he can only work for may be two hours a day.  I have asked him to apply for social security disability.[74]

Plaintiff again visited Dr. Paicopolis on January 14, 2009.[75]  During that visit, Dr. Paicopolis noted plaintiff's ischemic heart disease, the restriction that he not allow his heart rate to get above 80 or 90, and his orthopedic issues in his knee and hip.[76]  She did not want him to do any lifting or heavy work and concluded:  "He cannot work.  From my standpoint, he is disabled."[77]

---

[70] *Id.* at ML01790.

[71] *Id.* at ML01789.

[72] *Id.*

[73] *Id.*

[74] *Id.* at ML01803.

[75] *Id.* at ML01816.

[76] *Id.*

[77] *Id.*

Dr. Paicopolis noted on September 26, 2009, that she had filled out a disability Social Security form for plaintiff.[78]  Following that date through February 15, 2012 (the last date for which records were provided), Dr. Paicopolis indicated that plaintiff's coronary artery disease was stable.[79]  Dr. Laham performed another cardiac catheterization on plaintiff on November 10, 2010,[80] and made a final diagnosis of:  two vessel coronary artery disease; progression of circumflex disease, with lesion not readily amenable to PCI; and elevated left ventricular filling pressures.[81]

### Additional Information Received by Defendant

Defendant also received an APS form, dated April 18, 2010, from Mark Slovenkai, M.D., the orthopedic surgeon who performed a right great toe fusion on plaintiff on April 11, 2011.[82] Dr. Slovenkai stated that plaintiff had no limitations, and he had advised him to return to work full time to his regular occupation and full time to any other occupation.[83]

Defendant contacted Philips for attendance records but was advised that Philips does not keep records of days in and out of the office.[84]  Philips provided certain employment records for plaintiff:  including job information showing that plaintiff's standard hours were 40 hours per week and that his employment terminated May 1, 2007, due to retirement; salary history information; plaintiff's job description; and payment history reports for the period January 1,

---

[78] *Id.* at ML01794.

[79] *Id.* at ML01796–1802, ML01804–05, ML01807–15, ML01821–24.

[80] *Id.* at ML01720–25.

[81] *Id.* at ML01721.

[82] *Id.* at ML01840–43.

[83] *Id.* at ML01841.

[84] *Id.* at ML00099.

2007 through May 6, 2007.[85]  The payment history reports show that plaintiff had 80 regular hours and 44.10 vacation hours in the pay period April 9, 2007 through April 22, 2007, and that plaintiff had 8 regular hours and 40 vacation hours in the pay period April 23, 2007 through May 6, 2007.[86]

### *Defendant's June 15, 2012 Determination of Plaintiff's Claim*

On June 15, 2012, defendant sent plaintiff a letter explaining that it was denying plaintiff's claim for LTD benefits.[87]  Defendant noted that while plaintiff claimed that his disability began on February 23, 2007, the Social Security Administration had determined that plaintiff was unable to work as of May 1, 2007, the date of his retirement from Philips.[88] Defendant explained that it had contacted Philips to obtain an attendance log of days missed leading up to plaintiff's last day worked of April 30, 2007, and gave the following reasons for that action:

> We did this to determine if, in accordance with the Plan's Temporary Recovery provision quoted above, [plaintiff] may have possibly had a period of temporary recovery that supported a disability as of February 23, 2007, or any date prior to his retirement date of May 1, 2007.  Philips advised us that it does not have records of [plaintiff's] days that he was in or out of work for the period of time leading up to his retirement date of May 1, 2007.  Philips was only able to confirm that [plaintiff's] final date last worked was April 30, 2007, as he retired effective May 1, 2007 along with termination of his employment.

> Accordingly, based on Philips' records, the information does not establish that [plaintiff] was missing work due to a disabling condition prior to his retirement date of May 1, 2007.  In the absence of information establishing that [plaintiff] was Disabled prior to May 1, 2007, his LTD coverage would have ended due to

---

[85] *Id.* at ML01157–65.

[86] *Id.* at ML01163–64.

[87] *Id.* at ML01150–54.

[88] *Id.* at ML01151–52.

his retirement as of the first day after his date last worked of April 30, 2007, therefore making him ineligible for LTD benefits.

Nevertheless, in addition to Philips' records, we also considered [plaintiff's] medical information to see if it would support that he was Disabled as of February 23, 2007, or any other date prior to his retirement date of May 1, 2007.

In considering [plaintiff's] claim, we reviewed medical documentation from his original provider, Dr. David Hanson, which included office visit notes of February 23, 2007 and May 7, 2007.  The February 23, 2007 office note indicates that [plaintiff] reported feeling as though he was on edge, that he was in a lot of situational stress that resulted from him not enjoying life, and that he was thinking of what he might do in terms of either staying with Philips, or possibly retiring. The office note also indicates that [plaintiff] had insulin dependent diabetes and that he was learning to get it under control.  Dr. Hanson noted that [plaintiff] was under acute situational stress and depression, and Dr. Hanson's plan for [plaintiff] was to begin treatment with Cymbalta.  Otherwise, Dr. Hanson noted that [plaintiff] was doing well, and that he was in the process of remodeling a home in the New Hampshire area.

Dr. Hanson's May 7, 2007 office note indicates that [plaintiff] lacerated his right index finger on April 30, 2007, and that he was experiencing pain because the cut became infected.

The information we received and reviewed also included a response from Dr. Hanson to your firm's October 1, 2010 request for his medical opinion as to what date [plaintiff] was no longer able to continue his employment.  In Dr. Hanson's October 5, 2010 response, he stated that he cannot determine from his medical records what date [plaintiff] was no longer able to continue his employment, and that he does not have an opinion as to whether the onset of his disability pre-dated his last day of work on April 30, 2007.

In summary, the information on file does not establish that [plaintiff] was indeed missing work leading up to his retirement date of May 1, 2007, due to a disabling condition, as his medical information does not support his inability to perform his occupation as a Fellow Engineer prior to his retirement date of May 1, 2007.

In reviewing [plaintiff's] file, we have taken into consideration his Social Security Disability Income (SSDI) benefits award.  Please note that the award of SSDI benefits does not guarantee the approval or continuation of LTD benefits; the SSA's determination is separate from and governed by different standards than MetLife's review and determination.

Here, as stated above, the SSA awarded SSDI benefits using a date of disability of May 1, 2007, as of which date [plaintiff] was retired and no longer had LTD coverage.[89]

Additionally, defendant advised plaintiff in this letter of his right to appeal the determination and asked him to provide with any appeal "any office visit notes, diagnostic test results, and documented restrictions or limitations that would support a disabling condition of [plaintiff's] inability to perform his occupation as a Fellow Engineer prior to his retirement date of May 1, 2007," as well as "documentation supporting that [plaintiff] was unable to work, and was missing work prior to his employer's reported date last day worked of April 30, 2007."[90]

### *Plaintiff's Appeal*

On December 11, 2012, plaintiff appealed defendant's denial of his claim for LTD benefits.[91]  Plaintiff also submitted to defendant payroll documents from Philips showing that he had 80 regular hours and 44.10 hours of vacation time during the period ending April 22, 2007, and had 8 regular hours and 40 hours of vacation time during the pay period ending May 6, 2007.[92] Plaintiff also submitted office visit notes dated August 20, 2012, from Dr. Paicopolis (his New Hampshire cardiologist),[93] an August 20, 2012 letter from Dr. Paicopolis,[94] and a CD-ROM containing plaintiff's Social Security claim file.[95]

Dr. Paicopolis' August 20, 2012 letter stated:

---

[89] *Id.* at ML01152–53.

[90] *Id.* at ML01153.

[91] *Id.* at ML01110–14.

[92] *Id.* at ML01115–16.

[93] *Id.* at ML01118–19.

[94] *Id.* at ML01117.

[95] *Id.* at ML01120.

This is a 67-year-old white male.  In my opinion, prior to December 13, 2007, [plaintiff] had significant coronary artery disease which limited his ability to do his job to work in a meaningful way because of ongoing severe coronary artery disease.  This was detected immediately upon arrival to New Hampshire when I began taking care of him.  He had severe coronary artery disease which I expected [sic] been there for at least five years prior to him seeing me on December 13, 2007 and shortly thereafter I diagnosed him with severe coronary artery disease.[96]

Plaintiff's Social Security file included records from the Mowery Clinic in Salina, Kansas, where plaintiff received treatment from cardiologist Karil Bellah, M.D., in 2005 and 2006.[97]  After performing a dual isotope exercise stress test on plaintiff on September 21, 2005, Dr. Bellah noted the following conclusions:  abnormal nuclear stress test with very slowly upsloping ST segment depression; moderate-sized inferior wall infarction with minimal, if any, peri-infarction ischemia; and no wall motion abnormalities and normal left ventricular ejection fraction.[98]

On March 30, 2006, Dr. Bellah examined plaintiff who had no chest pain but complained of shortness of breath (which he attributed to a sinus infection) and of fatigue.[99]  About plaintiff's fatigue, Dr. Bellah noted:  "I don't think this is cardiac etiology.  I would be much more suspicious that this is due to his underlying sleep apnea which is currently untreated.  He will follow-up on this with Dr. Hanson as well."[100]

---

[96] *Id.* at ML01117.

[97] *See*, *e.g.*, *id.* at ML00537, ML00547–48, ML0054–55, ML00568–69.

[98] *Id.* at ML00547–48.

[99] *Id.* at ML00554–55.

[100] *Id.* at ML00555.

Plaintiff had another nuclear stress test on September 21, 2006.[101]  After performing that stress test, Dr. Bellah noted:  "Nuclear stress test once again demonstrates upsloping ST segment depression which is equivocal for ischemia.  The perfusion images demonstrate evidence for an inferior wall infarction with minimal if any per-infarction ischemia.  The LV ejection fraction is normal at 59%.  Overall the study appears largely unchanged from a year ago."[102]  Dr. Bellah also noted:  "CORONARY ARTERY DISEASE.  No symptoms at this time."[103]  Dr. Bellah planned for a yearly stress test again in September.[104]  During that visit, plaintiff complained of asthma and shortness of breath after exercising and expressed concerned that his beta blockers might be contributing to these symptoms.[105]  In response, Dr. Bellah recommended that plaintiff stop the beta blockers for about six weeks.[106]

When plaintiff returned to see Dr. Bellah on November 16, 2006, plaintiff reported that discontinuing the beta blocker had "made no difference at all in his shortness of breath or asthma."[107]  Therefore, Dr. Bellah recommended that he resume the beta blocker.[108]

At defendant's request, a nurse consultant reviewed plaintiff's medical records.[109]  The nurse consultant noted plaintiff's limited medical records for the period before May 1, 2007, and

---

[101] *Id.* at ML00568–71.

[102] *Id.* at ML00568.

[103] *Id.*

[104] *Id.*

[105] *Id.*

[106] *Id.* at ML00569.

[107] *Id.* at ML00574.

[108] *Id.*

[109] *Id.* at ML00126–41.

she stated that while the medical records indicated that plaintiff had had diabetes since 1993, there was no indication that his control had significantly changed at the time he went out of work.[110]  The nurse consultant also noted that there was no indication that plaintiff's cardiovascular disease was symptomatic at the time he went out of work.[111]  The nurse consultant also observed that plaintiff's osteoarthritis (that required surgery) occurred well after he had been out of work and his shoulder issue occurred after he had been out of work for an extended period.[112]  The nurse consultant recommended referring the file to an Independent Physician Consultant for further review.[113]

### Review of Medical Records by Independent Physician Consultant

At defendant's request, an Independent Physician Consultant ("IPC"), Louise Sheffield, M.D., MPH, Board Certified in Occupational Medicine, reviewed plaintiff's medical records, and on January 8, 2013, Dr. Sheffield prepared a report summarizing her conclusions.[114]  As part of her review, Dr. Sheffield spoke with Dr. Paicopolis, who opined that plaintiff should not work and that the coronary artery disease "present when [plaintiff] became her patient most likely would have been present years before."[115]  Dr. Sheffield also spoke with Dr. Chapin, the endocrinologist who treated plaintiff from February 2008 through 2011.[116]  Dr. Chapin stated that plaintiff "subjectively reported incapacitation with disequilibrium and headache as a

---

[110] *Id.* at ML00140.

[111] *Id.* at ML00140–41.

[112] *Id.* at ML00141.

[113] *Id.*

[114] *Id.* at ML00280–88.

[115] *Id.* at ML00280.

[116] *Id.*

hypoglycemic reaction after taking insulin that would last up to 4 hours."[117]  Dr. Chapin reported

that this degree of incapacitation was not typical of most patients and there were no objective

findings to correlate with the reaction.[118]  Otherwise, Dr. Chapin found that plaintiff had no other

physical or functional limitations related to diabetes while plaintiff was under his care.[119]

Dr. Sheffield attempted to contact Wini Schaedel, ARNP, who provided diabetes care to

plaintiff in 2007, but the number was no longer in service.[120]  Dr. Sheffield also tried to contact

Dr. Herzlinger Botein, the endocrinologist who treated plaintiff from September 21, 2011,

forward.[121]  Dr. Botein was not in the office when Dr. Sheffield called, but Dr. Sheffield left a

message requesting that Dr. Botein provide any current physical restrictions for plaintiff and

report whether plaintiff still had a problem with hypoglycemic reactions to insulin that would

cause him to be incapacitated for several hours.[122]

Dr. Sheffield concluded that plaintiff would have the following limitations:

I would opine [plaintiff] would have the following restrictions as related to his
cardiac disease.  He can sit continuously, stand for [a] maximum of 20 minutes at
a time and walk for a maximum of 15 minutes at a time.  [Plaintiff] can perform
this occasionally over an 8 hour work day.  [Plaintiff] should not push, pull, lift,
carry, climb ladders, twist, bend, stoop or squat.  These restrictions would start
when his care started with Dr. Palicopolis [sic] on 12/13/2007.

I would opine [plaintiff] would have the following restrictions for his right foot
osteoarthritis that required surgery.  He can stand or walk for a maximum of 10
minutes at a time.  He can perform this occasionally throughout an 8 hour period.

---

[117] *Id.*

[118] *Id.*

[119] *Id.*

[120] *Id.* at ML00281.

[121] *Id.*

[122] *Id.*

These restrictions would last from 12/18/2010 to 8/16/2011 while under the care of Mark Slovenkai MD, orthopedics.

I would opine the following restriction for the labral tear of the right shoulder.  No overhead work and no lifting, pushing or pulling greater than 10 pounds from 7/18/2011 to present.

[Plaintiff] would be unable to perform any activity for 1 hour per month to his hypoglycemic reaction to insulin.  These restrictions would apply from 4/14/2009 to 7/14/2011.[123]

Regarding plaintiff's coronary artery disease, Dr. Sheffield reported:

[Plaintiff] had a one day dual isotope exercise stress test with wall motion analysis and left ventricular ejection fraction performed on 9/21/2006 by Karil Bellah, MD.  The results concluded there was inferior wall infarction with minimal, if any, peri infarction ischemia and mild septal wall motion abnormality with normal ejection fraction.  [Plaintiff's] clinical exam on 9/21/2006 stated there was no orthopnea or edema, no dizziness or light headedness, and no near or presyncopal episodes.  His exam was unremarkable.  His shortness of breath was attributed to asthma.  [Plaintiff] was seen again by Dr. Bellah on 11/16/2006.  [Plaintiff] did not think there was any difference in his shortness of breath or asthma after stopping Toprol.  His lungs were clear and cardiac exam was regular.

There are no additional medical records in the file for cardiac evaluation from 11/16/2006 through Dr. Palicopolis [sic] evaluation on 12/27/2007.  While it is medically reasonable that the degree of arterial blockage noted on the cath on 1/31/2008 was present during this time frame, there is nothing in the medical file that documents and supports physical restrictions and limitations for the period under review January 1, 2007 through 12/27/2007.  [Plaintiff] was seen on 2/23/2007 by his primary physician Dr. Hanson.  [Plaintiff] was with situational stress and had no physical complaints.  His exam is unremarkable.  Diagnosis is Acute Situational Stress and Depression.  Cymbalta and Ativan were prescribed.[124]

### Comments on IPC Report

On January 16, 2013, defendant faxed Dr. Sheffield's report to the following healthcare providers who had previously provided treatment to plaintiff:  Wini Schaedel, APRN, Dr. Susan Herzlinger Botein, Dr. Goodman Fraenkel, Dr. Barrett Chapin, Dr. Kent Berquist, Kristen

---

[123] *Id.* at ML00284.

[124] *Id.*

Helling, Dr. David Roberts and Dr. Jacqueline Chang, Dr. Roger Laham and Dr. Mary-Claire Paicopolis.[125]  Defendant requested that each of these healthcare providers submit, by January 30, 2013, any comments he or she might have on the IPC report and, if not in agreement with the report, submit clinical information in support of the healthcare provider's conclusions.[126]

Defendant also sent a letter to plaintiff's counsel on January 16, 2013, enclosing a copy of the IPC report, advising that the IPC report had been sent to plaintiff's healthcare providers with a request that they review and comment on the report by January 30, 2013, and instructing that if the physicians required additional time for review and comment, plaintiff's counsel should provide a brief explanation concerning the reason for the extension.[127]

Dr. Kent Berquist of the Sleep Disorders Laboratory at the Salina Regional Health Center (where plaintiff had undergone a CPAP trial for sleep apnea in May 2006)[128] sent a fax dated January 17, 2013, stating:  "Since the time period is for 2007 forward and our treatment was in 2006 & did not see patient in person but only interpreted a test."[129]

Plaintiff's counsel requested, and defendant granted, an extension to February 13, 2013.[130]  On January 25, 2013, plaintiff's counsel provided to defendant updated contact information for plaintiff's healthcare providers.[131]  On January 30, 2013, defendant faxed the IPC

---

[125] *Id.* at ML00377–479.

[126] *Id.*

[127] *Id.* at ML00364–65.

[128] *Id.* at ML00712–13.

[129] *Id.* at ML00345.

[130] *Id.* at ML00339, ML00343.

[131] *Id.* at ML00340–41.

report and its request for comments, using updated contact information, to Wini Schaedel, APRN, Dr. Kent Berquist, Dr. Barrett Chapin, Dr. Goodman Fraenkel and Dr. Roger Laham.[132]

On February 7, 2013, plaintiff's counsel sent a letter to defendant enclosing (1) a personal statement from plaintiff, (2) a December 13, 2006 exam note/radiology report from Salina Regional Health Center, and (3) an April 14, 2009 letter from Dr. Chapin.[133]  In his personal statement, plaintiff discussed his job responsibilities at Philips, how his medical conditions affected his work, the conditions surrounding his leaving work, and the conditions affecting his ability to work.[134]  Plaintiff stated that he had one heart attack in 1995, he was concerned about having another, and he "felt that it would be best to take early retirement from the company to save [his] health."[135]  Plaintiff also added:

> I realized that if I were to file for disability in my opinion it would have been a protracted, stressful series of events and during this time we would have needed money to keep going.  Also, I felt it would have affected my ability to get another job.  No one wants to hire someone who may have a disability, despite what the law says.  I did not know how really sick I was until I relocated to New Hampshire and various tests were carried out with a new doctor.  I also had access to world-class medical care which was not available in Salina, Kansas.[136]

The April 14, 2009 letter from Dr. Chapin described plaintiff's history of Type II diabetes since 1983, with no microvascular complications but with the complication of coronary artery disease, following a myocardial infarction around 1994.[137]  Dr. Chapin further stated:

---

[132] *Id.* at ML00279–336.

[133] *Id.* at ML00200–06.

[134] *Id.* at ML00202–04.

[135] *Id.* at ML00203.

[136] *Id.*

[137] *Id.* at ML00206.

Ordinarily, type 2 diabetes is not a disabling condition.  [Plaintiff] is quite symptomatic when he has low glucose reaction.  His current insulin management has him having a low glucose reaction approximately once every month.  When that occurs, it incapacitates him and makes him unable to work for a period of about 1 hour, due to the symptoms of fatigue and headache.[138]

Defendant also received a letter from Wini Schaedel, APRN, dated February 4, 2013, which stated:

I started participating in [plaintiff's] diabetes management in 2006 at my practice in Salina, KS.  That May his diabetes was not in control.  Added Byetta to the medication regimen.  Due to other health issues and travel, he did not feel that Byetta was effective.  Was complaining of low blood sugar episodes while on Byetta.  September 18, 2006, his A1c was 8.47 (should be < 7.00).  In September he started on Novlog Mix 70/30 insulin 2 times a day.  In December, his control was still not optimum and he started him on intensive insulin management on 12-19-06.  For a time his blood sugars improved.  By the Spring of 2007 when he retired, his control was not optimum.  At that time he moved and was no longer in my care.[139]

On February 8, 2013, plaintiff's counsel sent a letter to defendant enclosing Dr. Paicopolis' comments on the IPC report which were:

I have reviewed and see below to have my recommendations.  No work.  I believe PT had ongoing CAD during the period prior to becoming my PT based on abnormal stress test and increasing fatigue.[140]

On February 13, 2013, plaintiff's counsel forwarded to defendant comments from Dr. Slovenkai, who stated:

My patient, [plaintiff], was seen between December of 2010 through August of 2011.  He underwent a right great toe fusion on May 4, 2011.  Clinical and radiographic results were excellent and he was released to work with no restrictions with regard to his foot musculoskeletal issues.[141]

---

[138] *Id.*

[139] *Id.* at ML00207.

[140] *Id.* at ML00216–17.

[141] *Id.* at ML00198–99.

Defendant provided all of the additional medical records received and all comments (including plaintiff's personal statement) to Dr. Sheffield, who prepared an addendum to her report on March 5, 2013.[142]  In her addendum, Dr. Sheffield stated that the additional information did not change her original recommendations in response to the questions posed.[143] In response to reviewing Wini Schaedel's notes about plaintiff's diabetes care, Dr. Sheffield concluded that the "information in the medical file does not support the degree of disability as reported in [plaintiff's] description."[144]

### *Defendant's Determination*

On March 29, 2013, defendant informed plaintiff by letter that it was upholding the denial of his claim for LTD benefits because he did not meet the Plan's definition of Disability before his retirement from Phillips on May 1, 2007.[145]  In that letter, defendant summarized the IPC Report and explained that "the IPC pointed out that there were no medical records for cardiac evaluation for [plaintiff] between November 16, 2006 and December 27, 2007, and noted that while it was medically reasonable that the degree of arterial blockage noted by Dr. Paicopolis on January 31, 2008 was present during the time frame for which he was not being evaluated, there were no records to support physical limitations and restrictions for this time frame, which is the period in question."[146]  Defendant recognized that many of the medical records were for a period after the first four months of 2007, which was the period in question

---

[142] *Id.* at ML00191–92.

[143] *Id.* at ML00191.

[144] *Id.*

[145] *Id.* at ML00175–79.

[146] *Id.* at ML00177–78.

for determining disability.[147]  Defendant also discussed the Social Security decision and noted

that the ALJ had relied on Dr. Paicopolis' records, but defendant recognized that Dr. Paicopolis

did not begin treating plaintiff until December 2007, several months after the time frame in

question.[148]  Defendant also noted that the ALJ determined plaintiff was unable to work as of

May 1, 2007, at which time he was retired from Philips and no longer covered by the LTD

Plan.[149]  Defendant concluded:

> In summary, while you stated in your appeal letter that [plaintiff] was disabled
> prior to his retirement date of May 1, 2007, the information in his file strongly
> suggests that [plaintiff] did not have restrictions or limitations that prevented him
> from working during this period.  Therefore, we have determined that he did not
> meet the Plan's definition of Disability and the decision to deny LTD benefits was
> appropriate.[150]

## II.      STANDARD OF REVIEW

In an ERISA case, where, as here, the parties have stipulated that no trial is necessary[151]

and a party moves for summary judgment, "'summary judgment is merely a vehicle for deciding

the case; the factual determination of eligibility for benefits is decided solely on the

administrative record, and the non-moving party is not entitled to the usual inferences in its

favor.'"  *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment &*

*Dependent Life Ins. Plan*, 605 F.3d 789, 796 (10th Cir. 2010) (quoting *Bard v. Boston Shipping*

*Ass'n*, 471 F.3d 229, 235 (1st Cir. 2006)).

---

[147] *Id.* at ML00178.

[148] *Id.* at ML00178–79.

[149] *Id.* at ML00179.

[150] *Id.*

[151] *See* Scheduling Order (Doc. 53 at ¶ III.b ("The parties do not believe a trial will be necessary and that
all issues will be resolved by cross-motions for summary judgment.")).

The Supreme Court held in *Firestone Tire & Rubber Co. v. Bruch* that "a denial of benefits challenged under [29 U.S.C.] § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." 489 U.S. 101, 115 (1989); *see also Kellogg v. Metro. Life Ins. Co.*, 549 F.3d 818, 825 (10th Cir. 2008). If the plan administrator has discretionary authority to determine eligibility for benefits or construe the plan's terms, then a court reviews the administrator's actions under a "'deferential standard of review.'" *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008) (quoting *Firestone*, 489 U.S. at 111). Under this standard, a court must "review the administrator's decision for abuse of discretion." *Foster v. PPG Indus., Inc.*, 693 F.3d 1226, 1231 (10th Cir. 2012) (citing *Glenn*, 554 U.S. at 111). When the claims administrator acts in a dual role as evaluator and payor of the claim and therefore operates under an inherent conflict of interest, the court must still apply the abuse of discretion standard weighing the conflict of interest as a factor in a combination of factors to determine whether the administrator abused its discretion. *Id.* at 1232 (citing *Glenn*, 554 U.S. at 117).

The Tenth Circuit "treats the abuse-of-discretion standard and the arbitrary-and-capricious standard as 'interchangeable in this context,' and 'applies an arbitrary and capricious standard to a plan administrator's actions.'" *Id.* at 1231–32 (quoting *Fought v. UNUM Life Ins. Co. of Am.*, 379 F.3d 997, 1003 & n. 2 (10th Cir. 2004) (per curiam), *abrogated on other grounds by Glenn*, 554 U.S. 105 (2008)). In this case, the parties agree that defendant had discretion to determine eligibility and that the Court should apply an arbitrary and capricious standard of review.

The review under the arbitrary and capricious standard "'is limited to determining whether the interpretation of the plan was reasonable and made in good faith.'" *LaAsmar*, 605 F.3d at 796 (quoting *Kellogg*, 549 F.3d at 825–26). "When reviewing under the arbitrary and capricious standard, '[t]he Administrator['s] decision need not be the only logical one nor even the best one. It need only be sufficiently supported by facts within [his] knowledge to counter a claim that it was arbitrary or capricious.'" *Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1098 (10th Cir. 1999) (quoting *Woolsey v. Marion Labs., Inc.*, 934 F.2d 1452, 1460 (10th Cir. 1991)). The court should uphold the decision "unless it is 'not grounded on *any* reasonable basis.'" *Id.* (quoting *Woolsey*, 934 F.2d at 1460). "The reviewing court 'need only assure that the administrator's decision fall[s] somewhere on a continuum of reasonableness—even if on the low end.'" *Id.* (quoting *Vega v. Nat'l Life Ins. Serv., Inc.*, 188 F.3d 287, 297 (5th Cir. 1999)).

## III.   ANALYSIS

Plaintiff asserts that he is entitled to judgment on the administrative record because the medical evidence in this case establishes that he was disabled under the terms of the Plan during his employment with Philips, and thus, defendant's denial of his claim for LTD benefits was an arbitrary and capricious determination. In contrast, defendant asserts that it is entitled to summary judgment in this case because its determination denying plaintiff's claim for LTD benefits was reasonable, was supported by substantial evidence in the administrative record, and was not arbitrary and capricious.

The Plan unambiguously provides that coverage under the Plan terminates when employment terminates. Here, it is undisputed that plaintiff's employment terminated on May 1, 2007, when he retired from Philips. Therefore, plaintiff is entitled to coverage under the Plan only if there is evidence that he was disabled before May 1, 2007, the date he retired from his

employment from Philips and his coverage under the Plan terminated.  *See de Coninck v. Provident Life and Accident Ins. Co.*, 747 F. Supp. 627, 631 (D. Kan. 1990) (stating that plaintiff's claim "can succeed only if there is some proof that he was disabled on or before . . . the last date of his employment.").  The Court has conducted its own thorough review of the administrative record and concludes that the facts in that record are insufficient to support plaintiff's claim that he was disabled, as defined under the Plan, before May 1, 2007.  Thus, the Court finds that defendant's denial of plaintiff's claim for LTD benefits was reasonable and not arbitrary and capricious.

Plaintiff asserted in the LTD claim submitted to defendant that he was disabled as of February 23, 2007.[152]  To support that claim, plaintiff relies on his own statement made during his initial interview with defendant that Dr. Hanson took him out of work because of his various medical issues.[153]  But plaintiff's contention is not supported by the administrative record.  To the contrary, plaintiff's allegation about Dr. Hanson taking him out of work is belied by Dr. Hanson's medical records which contain no such directive from Dr. Hanson to stop working.

Dr. Hanson saw plaintiff only once during the first four months of 2007.  On February 23, 2007, plaintiff visited Dr. Hanson and complained of situational stress.  Dr. Hanson's impression of plaintiff was acute situational stress and depression, and he prescribed Cymbalta and Ativan.  Dr. Hanson noted that plaintiff was "otherwise doing well," was learning to bring his insulin dependent diabetes under control, was being managed for hypertension and hypercholesterolemia, and was remodeling a home in New Hampshire.  Dr. Hanson's medical

---

[152] The Court notes that this date conflicts with the date plaintiff provided to Sedgwick when he made his initial claim for benefits on May 20, 2010.  AR at ML01985–87.  In the initial claim, plaintiff stated that the first date of his disability was May 1, 2007.  *Id.* at ML01987.

[153] *Id.* at ML00055.

records do not contain any restrictions or limitations on plaintiff's ability to work, and those records never mention a medical condition requiring him to reduce or stop his work at Philips. Moreover, plaintiff's contention that Dr. Hanson took him out of work is flatly contradicted by Dr. Hanson, himself, who has stated that he could not determine from his medical records the date when plaintiff no longer was able to continue his employment and that he has *no opinion* whether plaintiff was disabled before his last day of work on April 30, 2007.[154]

The only other medical provider who treated plaintiff in the first four months of 2007 was Wini Schaedel, a Certified Diabetes Educator. Likewise, her records do not contain any restrictions or limitations on plaintiff's ability to work or perform other activities. Therefore, plaintiff's medical records from the relevant time period do not support plaintiff's claim that he was disabled before his retirement on May 1, 2007.

Before his retirement, plaintiff had received treatment from Dr. Karil Bellah, a cardiologist, but those records also do not support plaintiff's claim that he was disabled before May 1, 2007. Dr. Bellah performed a stress test on plaintiff on September 21, 2006, and he noted that the study appeared largely unchanged from a year earlier. Dr. Bellah also noted that plaintiff had no symptoms at that time for coronary artery disease, and he directed plaintiff to undergo another yearly stress test again the following September. Plaintiff complained to Dr. Bellah of asthma and shortness of breath after exercising and expressed concern that his beta blockers might be contributing to these symptoms. In response, Dr. Bellah recommended that plaintiff stop the beta blockers for about six weeks. Plaintiff returned to see Dr. Bellah on November 16, 2006, and reported that discontinuing the beta blocker had not made a difference in his shortness of breath or asthma. Dr. Bellah recommended that plaintiff resume the beta

---

[154] *Id.* at ML01384.

blocker and prescribed that medication.  Plaintiff did not have any other visits with Dr. Bellah or

any other cardiologists before his retirement.  Dr. Bellah did not place any limitations or

restrictions on plaintiff's work or other activities.  Therefore, Dr. Bellah's records do not support

plaintiff's contention that he was disabled before his retirement.

Plaintiff also asserts that he was forced to take frequent sick and vacation days in order to

manage his medical problems in the time leading up to his retirement.  Defendant sought

attendance records from Philips to confirm this information, but Philips reported that it does not

keep attendance records of days in and out of the office.  However, Philips did provide

information showing that plaintiff had 80 regular hours and 44.10 vacation hours in the pay

period April 9, 2007 through April 22, 2007, and that plaintiff had 8 regular hours and 40

vacation hours in the pay period April 23, 2007 through May 6, 2007.  But there are no medical

records from that time period to support plaintiff's allegation that he was taking time off because

of medical problems as opposed to plaintiff simply using his vacation time before his retirement

date.  As described above, Dr. Hanson and Ms. Schaedel are the only two medical providers who

treated plaintiff during this time, and their records do not contain any reference to medical

problems that required plaintiff to reduce his work schedule or take time off of work.  Their

records also do not include any restrictions or limitations on plaintiff's ability to work or engage

in other activities.

Plaintiff's claim that he was disabled before his retirement is also belied by the personal

statement that his counsel provided to defendant on February 7, 2013.  In that personal statement,

plaintiff explained that he did not file a disability claim while he was still employed with Philips

because he thought it would have affected his ability to get another job.[155]  Thus, plaintiff admits

---

[155] *Id.* at ML00203.

that he was considering other employment after his retirement from Philips, thereby contradicting his claim that he was unable to work because of a disability.

Plaintiff relies heavily on the conclusions of Dr. Paicopolis, his cardiologist in New Hampshire. But plaintiff's first visit with Dr. Paicopolis did not occur until December 12, 2007, more than seven months after his retirement. Moreover, Dr. Paicopolis did not determine until September 8, 2008, that plaintiff was unable to work as an engineer and that he was limited to performing only two hours of work per day. Dr. Paicopolis opined in an August 20, 2012 letter that plaintiff had significant coronary artery disease which limited his ability to work in a meaningful way before December 13, 2007, and that plaintiff had severe coronary artery disease for at least five years before she saw him on December 13, 2007.[156] However, Dr. Paicopolis' opinion is not germane to the issue presented here because she did not start seeing plaintiff until more than seven months after the relevant time period. *See White v. Reliance Standard Life Ins. Co.*, No. Civ.A. 98-2075, 1999 WL 1243063, at *4 (E.D. La. Dec. 20, 1999) (in determining whether defendant's denial of benefits was arbitrary and capricious, the court refused to consider objective medical evidence submitted by a doctor who was only able to provide information about the plaintiff starting in December 1997, because plaintiff's coverage under the plan ceased on August 4, 1997).

Additionally, defendant requested, during plaintiff's appeal of the initial denial of his claim, that an Independent Physician Consultant conduct a review of plaintiff's medical records. Dr. Louise Sheffield reviewed plaintiff's medical records, obtained additional information from some of plaintiff's medical providers, and concluded that plaintiff's medical records did not document or support physical restrictions or limitations before plaintiff's retirement on May 1,

---

[156] *Id.* at ML01117.

2007.  Plaintiff does not even address, let alone controvert, the conclusions made by Dr. Sheffield in her independent review.  The Court has reviewed Dr. Sheffield's conclusions, finds them consistent with the other information contained in the administrative record, and determines that her findings are reliable.  Thus, it was reasonable for defendant to rely on Dr. Sheffield's conclusions when denying plaintiff's claim.  *See Graham v. Hartford Life & Accident Ins. Co.*, 589 F.3d 1345, 1357–58, 1361 (10th Cir. 2009) (holding that where the independent review of a board certified orthopedic surgeon hired by defendant was reliable and the plaintiff's medical records were inconclusive, defendant had a reasoned basis for denying plaintiff's claim for disability benefits).

Last, plaintiff asserts that defendant arbitrarily relied on the ALJ's determination in plaintiff's claim for Social Security benefits that he was disabled as of May 1, 2007, as a means to bar his claim for LTD benefits.  However, the administrative record shows that defendant relied on much more than simply the finding of the ALJ to conclude that plaintiff was not disabled before his retirement.  In its June 15, 2012 letter denying plaintiff's claim for LTD benefits and its March 29, 2013 letter denying plaintiff's appeal, defendant explained that its determination was based on multiple pieces of information including:  the employment records provided by Philips showing plaintiff's work and vacation time leading up to retirement; plaintiff's medical records; Dr. Hanson's October 5, 2010 statement that he could not determine when plaintiff was no longer able to continue working and that he had no opinion about whether plaintiff's disability predated his last day of work at Philips; and the IPC report prepared by Dr. Sheffield.[157]

---

[157] *Id.* at ML01152–53, ML00175–79.

Defendant cites several cases with similar facts to those presented in this case and argues that courts have upheld a claim administrator's decision denying benefits when the administrative record lacks evidence showing that the claimant was disabled before coverage terminated under the benefit plan.  *See, e.g.*, *Providence v. Hartford Life & Accident Ins. Co.*, 357 F. Supp. 2d 1341, 1345 (M.D. Fla. 2005) (concluding the claims administrator correctly determined claimant was not disabled before she resigned from her employment because none of her medical providers stated she was unable to work during the relevant time period and the only doctor who concluded that she was unable to work first examined the claimant more than two years after her resignation from employment); *Furleigh v. Allied Group, Inc.*, 281 F. Supp. 2d 952, 976–79 (N.D. Iowa 2003) (concluding the record did not support claimant's allegation he was disabled during his employment because although he may have been experiencing some symptoms of ataxia which progressed after his retirement, claimant was able to work full time until his retirement and was never placed on any restrictions by his doctors during his employment); *de Coninck v. Provident Life and Accident Ins. Co.*, 747 F. Supp. 627, 632 (D. Kan. 1990) (finding no evidence in the record that claimant was disabled before his termination from employment, and thus was not entitled to coverage under the plan); *see also Barnes v. Unum Life Ins. Co. of Am.*, 621 F. Supp. 2d 1097, 1105–06 (D. Or. 2009); *Graham v. First Reliance Standard Life Ins. Co.*, No. 04 Civ. 9797 (NRB), 2007 WL 2192399, at *3–7 (S.D.N.Y. July 31, 2007); *White v. Reliance Standard Life Ins. Co.*, No. Civ.A. 98-2075, 1999 WL 1243063, at *2–3 (E.D. La. Dec. 20, 1999); *Ciulla v. Usable Life*, 864 F. Supp. 883, 887–88 (W.D. Ark. 1994).

The Court has reviewed the cases cited by defendant and finds them persuasive here. Like the claimants in those cases, plaintiff argues that he was disabled while he was still

employed with Philips and thus eligible for coverage under the Plan. And similar to those other cases, the administrative record does not support plaintiff's allegation that he was disabled before his coverage under the Plan terminated on May 1, 2007, the date he retired from Philips. Under similar circumstances, the cases found it reasonable for the claims administrators to deny the claims for benefits. Likewise, here, the Court finds that it was reasonable for defendant to deny plaintiff's claim for LTD benefits based on the record before it.

In sum, the administrative record lacks evidence to support plaintiff's claim that he met the definition of Disability under the Plan before his retirement on May 1, 2007. To the contrary, there is sufficient evidence in the administrative record to show that plaintiff was not disabled during the time that he was employed by Philips and covered under the Plan. Therefore, defendant's denial of plaintiff's claim for LTD benefits was reasonable and not arbitrary and capricious.[158]

Defendant also asserts that it is entitled to summary judgment because plaintiff's claims are time barred by the Plan's contractual limitations provision. The Court does not reach this argument because it has already concluded that defendant's denial of plaintiff's claim for LTD benefits was reasonable and not arbitrary and capricious.

## IV.    CONCLUSION

Based on its review of the administrative record, the Court finds that defendant's decision to deny plaintiff's claim for long term disability benefits was not arbitrary and capricious.

---

[158] Plaintiff never argues that the Court should consider as a factor whether defendant has a conflict of interest as the claims administrator and payor of the claim. Even if plaintiff had asserted such an argument, there is no evidence in the record that a conflict of interest influenced defendant's decision. To the contrary, defendant took steps to reduce its bias by having an independent physician review plaintiff's claim. *See, e.g.*, *Holcomb v. Unum Life Ins. Co. of Am.*, 578 F.3d 1187, 1193 (10th Cir. 2009) (giving the conflict of interest factor "limited weight" when evaluating whether the claims administrator abused its discretion because the claims administrator took active steps to reduce the bias by hiring independent physicians to review the claim). Therefore, the Court has given this factor limited weight in its analysis.

Furthermore, the Court finds that the administrative record contains sufficient facts to show that defendant's decision was a reasonable one.  For these reasons, the Court denies plaintiff's Motion for Judgment on the Administrative Record and grants defendant's Motion for Summary Judgment.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant Metropolitan Life Insurance Company's Motion for Summary Judgment (Doc. 59) is granted.

**IT IS FURTHER ORDERED BY THE COURT THAT** plaintiff Andrew Gary Sigai's Motion for Judgment on the Administrative Record (Doc. 61) is denied.

**IT IS SO ORDERED.**

**Dated this 18th day of August, 2014, at Topeka, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**